Good morning, I'm Malcolm Zaraka for the Appellants. This is a case involving a collision between two organizations, each of which attempts to sponsor, protect, and register either a commercial or a domestic breed of animal. Counsel, before you continue, may I ask what you may deem to be an irrelevant question? Did the parties attempt to mediate this dispute? It was mediated unsuccessfully. Unsuccessfully, all right. With a magistrate judge. Judge Infante mediated it, but without success. Okay, then my next question is, since you were affiliates, how can there be a conspiracy? Because the Copperwell Doctrine essentially requires that the acquisition of control over the junior member of the joint activity itself be a legal and untainted process, so that if the JRTCA, in the process of agreeing to affiliate the member clubs, demands that as part of the affiliation, they observe a boycott against the AKC and former members of the JRTCA, even if their dogs perfectly meet the JRTCA breed standard and have previously been registered there, that offends Copperweld, which reiterated the point that even the formation of the association may itself be an illegal combination, if the purpose of it is to commence a boycott against a competitor, in this case the competitor of the JRTCA. It's important to remember as well that the concerted activity here extends beyond the senior JRTCA and the affiliate clubs. It starts with a club called the JRTCGB, the Great Britain Club, which is the original promoter of the exclusion of kennel club registration. Then it picks up the JRTCA in response to the demand of the GB that they not permit kennel club dogs to participate in their affairs. Then it goes from the JRTCA not only to the affiliate clubs, but to the members, because the JRTCA not only requires the individual affiliate clubs to observe the boycott, up to and including some very tough ways of dealing with people who resign or are expelled from the JRTCA, but requires the members to observe the same boycott. If you look at the testimony here of the people who testified who were boycotted, who ended up on the blacklist, they lost all ability to deal with the individual members of the JRTCA with whom they had done previously business on the same dogs. These are dogs, some of them champion JRTCA dogs, which are now, not because they don't meet the breed standard, but simply because they're being boycotted for dealing with the AKC, who bring their dogs and attempt to show them that it was our problem, or attempt to breed them or sell their dogs. They testified uniformly they were cut off, so the members participate in this as well. Now, I don't think there are any circumstances in which a boycott between a club and its members, under the Copperwell theory, could be deemed to be a unitary organization. Members don't belong to a club, and consequently, if the members are also forced to observe the boycott, I don't think the JRTCA has much chance under the Copperwell cases to say that this is really a unitary organization. Thank you. I beg your pardon? I have a question for you, sir. Yes. Are there any cases in the federal court system, in any circuit, that have applied or discussed the application of Copperwell to associations like these? I think the direct answer is no. There have been discussions of what kind of activity one of these registration clubs can engage in, but Copperwell, I don't think either side has found a direct case that says Copperwell protects the member club and its affiliates or its members from concerted activity that has the effect of a boycott. That struck me as a somewhat unprecedented question, and I'm not sure which side wins on it yet, so I guess I would just like to hear your argument, but I did want to make sure no case had eluded me. I don't think it has. If it has, it's eluded both sides. The real issue, it seems to me, as posed by the JRTCA, is, apart from the unitary organization principle, if we feel strongly enough that the protection of the dog or any other animal in any other breed association will be diminished seriously by the registration with a kennel club, what are the limits of economic activity that we are entitled to participate in in order to thwart that recognition, in this case by the AKC, and punish our members for dual registration of the dog? We can't complain that the dog's not the same. The dog is the same dog that was registered by the JRTCA. It meets the breed standard, and in a couple of cases at trial, you see that the dog in question was a champion JRTCA dog. So it's not the dog that's being protected. The source of the boycott is the belief that the AKC has an invariable effect, no matter what its breed standard, in dumbing down the dog. To put it as plainly as possible, that's really the belief. The JRTNNC really shares that belief. There was no struggle at all against the breed standard, and if you read the JRTCA's brief, they quote at length the things that we said to try to demonstrate to the mother club that we were not trying to abandon the protection that the mother club was attempting to offer the dogs. What was appalling to us, and which we took to the JRTCA, were the legal implications of doing this. And when we were threatened with suit by the first two of these breeders, we went to the JRTCA, as you can see in the record, and said, you know, we're here on the front line trying to administer your policy, and we're threatened with suit by two of these people who own JRTCA dogs, so you can't claim there's anything wrong with the dog, and who demand admission to our club because they have these conforming dogs. They thought what you had was basically two clubs, each with national and with local affiliates, and they had different philosophies of what a Jack Russell terrier conforming to breed standards is. Not really. What divided the JRTNNC from the JRTCA, and ultimately a number of other clubs that refused to affiliate when the issues began to sharpen, was their unwillingness to sign the affiliation agreement, which committed them to boycotting dogs and their owners, even if they were provable to meet the breed standard of the JRTCA. My problem is, if I understand it right, the Jack Russell terrier network and its affiliates think that a proper Jack Russell terrier is defined pretty much by behavioral characteristics, and you can't tell for a while after they're born. And the Kennel Club of America thinks a Jack Russell terrier is defined by appearance and size, and who the sire and the dam are, or sire and bitch, however they put it. And it seems like you can't have a conspiracy between the national American Kennel Club and its member organizations, and it seems like there's a legitimate reason for them to preserve their own breeding standards and have this philosophical disagreement by boycotting each other. We're close to a major problem. The parties don't quite line up in the way you've described, and I'll clear it up for me. It's easy for me to mix them up because there are a lot of cases and they all sound alike. The AKC and the JRTCA have a breed standard that isn't materially different one from the other. It's not what the dog should look like ultimately. There's a little bit of height variation in how big they think the dog ought to be. The criticism of the JRTCA of the AKC is that it will register litters at birth, which goes to exactly the point you're making, that a registration of an entire litter of dogs at birth avoids the opportunity to determine later, if you wait for a while, as the JRTCA does, whether the dog turns out to be what it should be simply by virtue of the fact that it's born of two parents that have been registered by the organization. The AKC presumes that if it's registered, the parents, that the progeny are okay. The JRTCA requires that each dog be registered generation by generation, and the JRTNNC believed, as the JRTCA did, that that was a much wiser, more protective way of going. We never had a problem with trying to enforce that standard. Where we got into trouble was when JRTCA members who had dogs registered with the JRTCA wanted to bring those dogs to a JRTNNC trial sponsored by the JRTCA, and the dogs were already registered with the parent organization. And these people complained they were on a blacklist, which invited the affiliate clubs and the members to shun them. And I know you've seen the very hard language that Judge Ware used against the JRTCA for it's unnecessarily terrorist. If you show your dog with the network clubs, then you've lost your ability to register them with the American Kennel Club, something like that? No, the American Kennel Club observes no such effort to squelch competition. You can register your dog with the AKC and show AKC after it's been registered with the JRTCA and is entitled to be shown there. But if you do, your membership in the JRTCA is terminated without notice or hearing. It's just an ipso facto loss of membership. And you thereafter must be boycotted and shunned by the JRTCA. So in effect, even though your dog meets all the standards, you've moved to the AKC in a permanent way. The problem with that for all of these breeders that testified is that that ruined them. It essentially has shut down the JRTNNC, and it has ruined these individual breeders who can't get enough people to deal with them, even on the merits of their animals, to breed the dogs and sell the puppies and go on in the commerce of which they're a part. That's the problem. Can a club have a conflicting organization rule? Let's say there was a, I'll date myself by using an older example. Let's say there was a Dean Martin fan club, and they said to be in our Dean Martin fan club, you can't be a Jerry Lewis fan. That could have happened, too. Can a club do something like that? I don't believe so. When the activity that you're centered around requires you to involve yourself in a commercial boycott, I think it's just the same as if GE had a fan club and said, you can belong to this fan club, but you can never buy a Westinghouse product. This spills over immediately into competition on an economic basis, and I just can't see. I know that the JRTCA believes the First Amendment expressive organization doctrine protects it, but those cases are clearly limited by the doctrine that when you begin to invite a commercial boycott, you step beyond the legitimate hagiography that you can have a parade and carry signs that say, we don't like the AKC, the AKC is bad for dogs. You can do all kinds of things that imply an urge not to patronize, but when you directly go after individual customers whom you know to have good dogs, who have met your own standards, and attack them because they've gone to the AKC, I cannot, just in my own sense of where the balance lies, imagine that that would work. The final thing is to talk just for a moment about the Lanham Act. We wrote in the brief that we thought maybe the district court lost its way just a little bit there, because the Lanham Act in the Ninth Circuit does not require that the plaintiff be a direct competitor of the defendant, but that the activity involved be within the zone of competition. And the best example of that was the case of the singer, Wait, who got into a dispute with Frito-Lay because they did a very close parody of his voice in a Frito-Lay commercial. Well, he wasn't a competitor of Frito-Lay, but the Ninth Circuit said, nonetheless, it was clear that the misuse of his voice in a way to suggest that it was he who was singing was within the zone of protection of the Lanham Act. These breeders are exemplative of the competition between the AKC and the JRTCA. The minute that they pass from the JRTCA and register their dogs with the AKC, now the competition in registries is directly at issue, and it's to discourage that and forbid it that the JRTCA publishes the blacklist, which is a way of saying to JRTCA members who are still in good standing, you go to the AKC and here's what's going to happen to you. Your name's going to show up on the blacklist, and just ask around to see what impact that'll have on your kennel. You'll be ruined. We've done it to others before, and we'll do it again. I can't imagine that that can fall within the expressive organization rights of free speech. That's a direct commercial misrepresentation of what these blacklisted dogs amount to. Tell me if I've got this right. If the American Kennel Club and its local affiliates are treated as one organization so that they can't conspire with each other, then we never get to the boycott issue, because General Electric could indeed refuse to buy motors or parts or anything else from Westinghouse. If you regard the concerted activity as limited to the JRTCA and its affiliates, and you regard those as a unitary organization, that's true. To do that, however, you have to get around the fact that the boycott really starts in Great Britain and is practiced not only by affiliates of the JRTCA, but its members have to sign up as well, that they'll practice the boycott. Now, I don't imagine there could be a case in which a unitary organization could consist of people, because people don't own each other. I've got affiliates of AKC who have to boycott its members, and they're not part of the same entity. Is that it? Well, certainly the JRTCA and its members, by definition, can't be unitary, because the senior club doesn't own the minds and souls of these people and can't be deemed to have a legal right to dictate to them what their philosophy and competitive ideas are. But they do share a common goal, do they not? True. And that's promote the breed of Jack Russell Terriers. True. That's the rub, really, and we sympathize with that. And the only problem, ultimately, about all of this is if you admit the dogs to your dog trials, which is really, in large part, what this is all about, the dog trials themselves have a continual process called the confirmation process. What does dog trial and confirmation mean? Okay. If you go to a dog trial, you'll find a number of things going on. What's a dog trial? A dog trial is a gathering of dog owners and their dogs, all of them within the breed, to run competitions against each other. So it's a dog show. It's a dog show. Exactly right. Okay. I'm sorry I interrupted. Dog show is really the proper term. In the JRTCA, one of the first things that happens at that dog show is there's called a confirmation proceeding, and that takes the dogs and measures them for whether they meet the breed standard and which best meet the breed standard and should, therefore, be called champion dogs. So here, in every one of these trials, you have an immediate contest to see whether the dogs that are competing against each other are exemplary members of the breed. Now, if you let AKC dogs into those trials, particularly ones that have already been registered with the JRTCA and we know meet the JRTCA breed standard, and if over a period of generations those AKC dogs begin to fail to meet the high standard of the JRTCA, first of all, as Holmes said, the best test is in the marketplace. Let people come in and show their wares, and if you're right that the AKC is going to be the ruin of this breed, you'll find out, and you'll have a basis in the confirmation trial to note it. And then it becomes a public competition, which demonstrates that you were right from the beginning to fear that the AKC would cause this breed to be reduced. So it's just difficult to see why the JRTCA is so afraid of a competition which will demonstrate its beliefs if they're true. Thank you very, very much. Thank you, counsel. May it please the Court, good morning. My name is Eric Haas, and I'm counsel for the JRTCA, the defendant. As Judge Nelson suggested with her first question, why we haven't mediated this case, there are fundamental differences between the AKC view of the Jack Russell Terrier and the JRTCA view of the Jack Russell Terrier. They're so fundamental that I'm standing here in front of you. They're so fundamental that this case has been pending for a number of years. And we do call them trials. We don't call them shows. We call them trials because on the JRTCA side of the fence we think we are promoting the working instincts and abilities of these dogs in the field. We think of them as field dogs. And right or wrong, we view the AKC as running shows where you walk around with well-paid handlers and you put them on tables and you are trying to breed to a paragon. You are trying to standardize. You are trying to find the perfect specimen of the breed. And their breed standard is different and permits them to do that. To us, to the JRTCA, that's Frankenstein. We don't want that. We think that's harmful for the breed. We think it's irrevocably harmful to the breed. And the expert testimony in this case establishes that it is harmful to the breed. And so that's why we're here. A little bit about my club or my client. It's a nonprofit educational organization, a so-called 103C7. It has no employees. All its officers are volunteers. What it does have is a message, and its message is, right or wrong, that kennel club recognition for any breed is the ruination of the breed. And there was a lot of evidence that was put before Judge Ware below on that point and what has happened to other breeds after they were recognized by a kennel club, a fox terrier being such an example. A fox terrier named after initially its ability to go actually chase a fox. Today fox terriers couldn't find a fox. And the mechanism that we use to assure that our members and our affiliates and our breeders and our judges are committed to our viewpoint is a membership rule, which has been called throughout the case the so-called conflicting organization rule. I wanted you to address that rule a bit because before one gets to the issue of boycott, it seems to me you could also analyze whether that rule itself is a legitimate rule or whether it constitutes an unreasonable restraint of trade. And that rule has some implications for what comes next. So for the boycott, for all the issues in the suit, give me your perspectives on that rule. Well, again, it's the mechanism that holds our club together. It generally provides. It is not one rule in one place. It permeates our documents and the agreements that judges and affiliates and members sign. Membership is only for one year. It's renewed on an annual basis. And each year there's an application, and it's in our submittal, is Exhibit P, which says in very bold letters, with our constitution on the reverse, that if you want to join us, we are anti-kennel club recognition. And you are not welcome if you have a dog that's registered with the kennel club or you are participating in kennel club activities. And we believe fervently that you have to keep a bright line between those two approaches or, again, the dog will be ruined. That, I believe, is the essence. Judges are to acknowledge the same. Our affiliates, which is at Exhibit D as in dog, I mean, we're looking for people who share our beliefs and our viewpoints. I mean, there's just no reason to join us or to form an affiliate club with us if you don't abhor kennel club recognition. And we established, to the satisfaction of the Court, that the conflicting organizations. So steamed about it. It's important to the case, and I'm not sure I get what. Well, because the complaint, the relief the plaintiff seeks is to force us to repudiate the client's core belief. Look, I understand core beliefs about Islam or Christianity or something, but I don't understand core beliefs about a breed of dog. What are they fighting about? Well, the first question that was asked me when I got this case was, did I own a dog? And I said no, and the client said, that's probably good. I should bring some objectivity to this process. Let me focus a little more. I have a couple of colleagues, real nice dogs, and every now and then we talk to people that know something about dogs. Ours are fancy, pedigreed dogs, and they tell us something about you're supposed to put weights on the ears or you're not supposed to put weights on the ears. I don't know what they're talking about. I don't care. Dogs' ears are fine. Is it something like that, like one club says you're supposed to put weights on their ears and the other one says that's cruel to put weights on their ears? Well, in a fashion, I'm confident that you've registered your dogs with the AKC, because I can't imagine how weights on the ears is going to improve the working instincts or abilities of your dogs. It's just, I guess, a different viewpoint. And another point I'd like to make so it's not lost in the shuffle is we'll take these people back. Is one of these clubs one that focuses on appearance and does things like weights on the ears? Yes. The AKC, the American Kennel Club. As Mr. Misuraka told you, when you register your dog with the American Kennel Club, the only thing that you are being assured of is that its parents were both also AKC, American Kennel Club, registered. It's not a validation of the quality of the dog, the health of the dog. We look at registration entirely differently. We will not permit a dog to be registered until it's one year old. And then we want pictures and we want a vet certificate as to the health of the dog. And where's the economic sense in that? I mean, if we're really in this for the money, if this is really driven by economics, why don't we do it the AKC way, register them immediately when they're born, when people are excited to have the new puppy and all the paperwork is right there from the breeder? We won't even take it. We are waiting a year for the dog to develop and for the proper submissions to be made to us before we'll put it in our registry. And as I said, we'll take these people back. If they will repudiate, crazy as it is, if they, quote, repudiate, they'll change of mind and repudiate kennel recognition, and we ask them symbolically to write a letter to the AKC, the American Kennel Club, and say, I'm no longer supporting you, we'll permit them back. There will be a probation period of a couple years, if you will. The breeder is concerned because the dog is more marketable if it's registered with both? Well, I guess that's the subcurrent here, yes. For whatever cachet there could possibly be with being able to take a dog to a marketplace and say I'm both the AKC and JRTCA registered, that may be the undercurrent of why I'm also standing here. Because after all, the plaintiff is a former affiliate of ours who wanted in a declaratory relief action to determine the legality of this rule. They got their determination, but here I still am. I suppose if the AKC adopted your rules, i.e., you wait a year before you make a decision, that you would all be together again? No. No, there are people, the AKC breeders, American Kennel Club breeders, really don't want to have much to do with the JRTCA. They really do view this as two different dogs. We're actually going to have product differentiation in the JRTCA world in a short period of time. They have renamed their dog. They don't want to call it a Jack Russell Terrier anymore. When you turn on the Westminster in a couple months, it will be the Parson Russell Terrier, for the express purpose of distinguishing it from the dogs that we like. The big deal is, I would say, diversity. And one aspect of the breed standard that might help the court would be the height. Our breed standard for height, which is measured at the withers, at the shoulder of the dog, is anywhere from 10 to 15 inches. Well, the AKC can't imagine a standard that's that broad, that would encompass that many different heights of dogs. Its standard, its height standard, and its Parson Russell standard is 12 to 15, with an ideal height of 14 inches for a bitch and 15 inches for a dog. I see why mediation didn't work. Okay. I'd like you to get back just for a moment to my preliminary question. We take your conflicting organization rule. What are the purposes of that rule that your client thinks are legitimate or necessary for its existence, and what are the anti-competitive impacts of that rule? Well, the rule, we believe, is necessary to, and its purpose is to keep the dogs, in essence, segregated. The purpose of the rule is to, is not to create any anti-competitive effect. There is expert testimony from a terrierman who came from England to explain, contrary to what Mr. Rocca suggested, this dog, under the AKC standard, which is a fairly recent event, will irrevocably change. It will basically get bigger. And the purpose of the dog, and I've been talking about working dogs. That's a euphemism. What we're talking about is hunting. What the Jack Russell Terrier really was bred for over the years and has come to be is a dog that hunts various quarry in England and was brought to this country. And, again, at the risk of being didactic, and I know I don't have much time, we've all seen the Gainsborough pictures with the aristocrats in the red coat and the hounds. Well, that's not the whole hunting picture. You need a Jack Russell Terrier because what's going to happen is the quarry on the hunt is going to go into a warren and there's really nothing to do. The purpose of a Jack Russell Terrier is to go down underground and actually cause that quarry to bolt again. And it's got to be trained not to get too close so it's all cut up. It can't be too far away in the warren or it won't motivate the fox or the quarry to do anything. It's got to be perfectly trained to get this fox to a point where it bolts up to ground and now we're off again and the hunt is on. We really believe all that will be lost without being able to maintain our particular viewpoint. The testimony I was alluding to before says you just can't have one registry of both kinds of dogs and assure us of the preservation of the dog we have now. You can't have one judge looking at both standards. You really can't. And so getting back to the cachet of having two registrations, I mean it's going to be as though you're registered with the poodles and the cocker spandrels. I don't see that. It seems to me that your adversary makes a good point when he says that the individual breeders are not part of the same entity, so there is a combination. And the breeders in one club won't be able to perfectly overlap, or the dogs won't be able to perfectly overlap, but it seems like some dogs would meet the standard for both clubs. They'd be good hunters. They'd have health certificates after one year. They'd have all the characteristics of the one club. And they would also be 14 inches for a bitch or 15 inches for a dog and have the appearance that the other club likes. So they could be registered with both, command a higher price. The purpose for the diversity in the height is because quarry is different and terrain is different and you need smaller dogs. I can see you'd want a smaller dog to go in a hole. Well, there will be no smaller dogs. Why? Because the AKC will not be breeding them, because they won't even get into this confirmation ring, because they'll be less than 12 inches in the withers. Those will get more money, so the ones that are only registered with the one and are smaller won't be able to be bred? There will be no interest in any AKC person to breed them because they can't even get them into the ring to qualify to be walked around. They'll be shown the gate, as the phrase goes. And it's hard to find a network for hunting. I'm sorry, Your Honor? So you're saying that if we can't segregate them and that requires enforcement against the breeders, not just the clubs, then the smaller dogs that are better for hunting won't be bred anymore  That's correct, Your Honor. Both clubs have breeders' code of ethics, where they're going to breed to that standard. And to our expert, it was just incomprehensible that one breeder could be breeding to two standards simultaneously with one dog. It's just not going to work. Back to the analogies, the Dean Martin thing. I've been struggling for what is analogous to this. The closest I can come to would maybe be the franchise case, where a franchisor and its franchisees, and there's a case that suggests they are a single entity for the purposes of the antitrust law. The JRTCA does not breed dogs. Let's just take that because we can use examples familiar to everybody. If McDonald's said, and I actually don't know what their standards are, but if they established a rule that said no McDonald's franchisee can be a Burger King, it could also be a franchisee for another fast food restaurant. Would that be an antitrust problem, or are there cases that apply copper weld to the franchisor? Yes. I don't know that it applies copper weld, but it's cited in our brief, the franchise-franchisor case I have. But that's not really, that hasn't been well established like throughout the circuits or anything. Correct, Your Honor. Kind of open territory, I guess. Correct, Your Honor. I mean, it's a very unique case in very unique circumstances. I can't imagine there will be many more of them either. Any other questions? Yes. I had a question about the JRTNMC submitted a declaration saying if it were forced to pay, it would be forced into bankruptcy if forced to pay a $17,000 judgment. Why does this provide sufficient information for Judge Ware to have denied your client costs? Well, I'll confess that that declaration is more probative than the other two as to the individuals. I can only respond that I would think that we made, on evidentiary points, that I don't think that there was enough before the court to make any actual determination of the financial ability of the club. I don't think that the court would have had the capacity to make any determination of that without having to go through a process of out-of-state, out-of-circuit cases, talk about the need to submit some kind of documentary support if a party is seeking relief from costs on the basis of financial inability to pay. We review that issue for abuse of discretion, am I right? Yes, that's correct. On the cost issue, absolutely. And on that, you haven't been arguing your appeal on that in the time you've got. So I assume you're happy with your briefing, letting that one go to the briefing and just addressing the copper weld issues in the time you've got. That's correct, Your Honor. Thank you. Are there any other analogies in the commercial context that you think shed light on whether, or private clubs that shed light on whether a conflicting organization rule can have been forced through some sort of boycott mechanism? No, Your Honor. Okay. Thank you. Thank you, Your Honor. Thank you, counsel. Is there no further questions? Thank you, counsel. Thank you, Your Honor. Thank you, counsel.
judges: Dw Nelson, Kleinfeld, Gould